Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 1 C 2 | **DATE** | 11/19/2003 |
| **CASE TITLE** | U.S.A. ex rel James Fields vs. James Chrans | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, we deny the Section 2254 petition for a writ of habeas corpus brought by petitioner James Fields. This is a final and appealable order. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | number of notices |
| Notices mailed by judge's staff. | |
| Notified counsel by telephone. | NOV 21 2003 date docketed |
| ✓ Docketing to mail notices. | |
| ✓ Mail AO 450 form. | docketing deputy initials |
| Copy to judge/magistrate judge. | |
| courtroom TSA deputy's initials | 03 NOV 21 PM 8:25 date mailed notice |
| | Date/time received in central Clerk's Office / mailing deputy initials |

Document Number: 19

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA ex rel. )
JAMES FIELDS, )
) No. 01 C 0002
Petitioner, )
) Wayne R. Andersen
) District Judge
v. )
)
JAMES CHRANS, )
)
Respondent. )

**DOCKETED**
NOV 2 1 2003

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the petition of James Fields for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, we deny the petition for habeas corpus.

## BACKGROUND

Petitioner does not challenge the statement of facts set forth in the order of the Illinois Appellate Court affirming his first degree murder convictions. *People v. James Fields*, No. 91 CR 20467 (Ill. App. First District, December 26, 1996). For purposes of federal habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e). Accordingly, we will adopt the facts as our own.

Petitioner was convicted of two counts of first degree murder largely on the testimony of two witnesses, Andrew Rudolph and Alesha Parks. Prior to trial, both Rudolph and Parks had given statements to the police, the prosecutors, and the grand jury which differed from their testimony at trial. Petitioner cites to the inconsistencies in these witnesses accounts in his habeas petition. Petitioner claims that the out-of-court statements of Rudolph and Parks used

19

by the prosecution during the trial were false. With this background in mind, we turn to the facts.

On June 9, 1991, Willie Range, James Campbell, Andrew Rudolph, and Barbara Wiley lived at an apartment located at 439 E. 111th Place in Chicago. When Barbara Wiley returned home at 2:00 a.m., she found Range and Campbell fatally shot in the apartment. At 2:25 a.m., Chicago police officer William Peak discovered the bodies on the apartment's dining room floor. They were still bleeding.

Dr. Mitra Kalelkar, the assistant Cook County Medical Examiner who performed the autopsies, testified that each of the victims was killed by a single gunshot wound to the head, fired from close range. The bullets she retrieved from the victims were unsuitable for calibration.

Andrew Rudolph testified at trial that he was asleep in the apartment at 1:30 a.m. on June 9, 1991, when the shooting occurred. The gunshots awakened him, but he did not recognize anyone in the apartment. Despite this in-court testimony, Rudolph admitted that, prior to trial, he told the police, provided a written statement to an assistant State's Attorney, and testified before a grand jury that he saw Petitioner in the apartment seconds after the gunshots woke him up, standing over the bodies of Range and Campbell.

Rudolph testified at trial that he was intoxicated and high on marijuana at the time of the shootings and when he made his statements at the police station. He claimed that he gave his out-of-court statements to the police because the police threatened several times to charge him as an accessory to murder. Rudolph also stated that he read only part of the written statement before signing it.

2

After Assistant State's Attorney Lynch testified that he took a written statement from Rudolph on June 9, 1991, he read the entire statement to the jury, over objection from defense counsel. Rudolph's entire grand jury testimony was then read to the jury.

Detective Jack Hines testified that he spoke with Rudolph at 7 a.m. on June 9, 1991, in the police station. Rudolph told Detective Hines that he saw Petitioner in the apartment and that Petitioner's arm was pointing downward toward Range, who had been shot and was lying under the table. Petitioner looked at Rudolph, then walked out of the apartment. Rudolph told Detective Hines that, after Rudolph saw both victims shot on the dining room floor, he went outside where he saw Petitioner get into a car and drive away. According to Detective Hines, there was no indication that Rudolph was intoxicated or high on drugs when he gave his statement. Detective Hines denied threatening Rudolph with charges or mistreating him in any way.

At trial, Petitioner's girlfriend, Alesha Parks, testified that in the early morning hours of June 9, 1991, she and Petitioner were near the apartment at 439 E. 111th Place and were talking to Range and some other people. She further testified that Petitioner did not have a gun. After Janice White, Range, and another woman let them into the building, White and Petitioner had a conversation, but Parks could not hear what was being said. When White, Range, and the other woman went upstairs to a second-floor apartment, Parks and Petitioner remained on the first floor. Parks testified that, a short time later, White reappeared. Parks testified that White did not come downstairs to talk with Petitioner, but instead, stayed on the second floor and summoned him. When Petitioner went upstairs, Parks testified that she left to get a jacket and did not return to the building.

Prior to trial, Parks had made a written statement at the police station on June 9, 1991 and signed that statement. Her written statement to the police differed from her trial testimony in many respects. In her written statement, Parks said that she heard Petitioner arguing with Range about cocaine. Petitioner told Parks that "they were trying to play him" and "he should go and kill all four of them." In her written statement, Parks stated that Petitioner walked her downstairs before he returned to the apartment to use the washroom. Two minutes later, as Parks was walking on the street, she heard two loud gunshots and then saw Petitioner come out of the building. In her written statement she stated that Petitioner had a gun, which he put in his waistband, and that he walked over to two men, Snake and Jimmy, and said, "I shot him. Come on. He's dead," then got in the car and drove away.

During her trial testimony, Parks testified that her prior statements at the police station were coerced. When she returned home from the police station, she told her parents that she had given a false statement. They told her to tell the truth to the grand jury, but when Parks met with Assistant State's Attorney Black prior to the grand jury hearing, she reluctantly agreed to testify in conformance with her statements at the police station.

On June 11, 1991, Parks testified before the grand jury. Parks' grand jury testimony mirrored her statement to the police and, thus, was inconsistent with her trial testimony primarily in the same respects that her written police statement differed from her trial testimony.

Parks told the grand jury that, when she and Petitioner entered the vestibule, Petitioner unscrewed the light bulbs, then pulled a revolver out of his waistband and put it on the ledge. Parks could hear Range and Petitioner arguing on the second floor. Parks testified before the

grand jury that Petitioner told her that the people inside were begging for cocaine and that "he should go in there and shoot all four of them, and maybe they have a better life." Parks testified before the grand jury that she then left and, shortly after she left the building, she heard two gunshots then saw Petitioner coming down the street. Parks testified before the grand jury that Petitioner put a gun in his waistband, then told Jimmy and Snake that he "just shot him, they're dead." Petitioner got into a car and left.

Assistant State's Attorney Lynch read Parks' written statement to the jury in its entirety, and Assistant State's Attorney Black testified about the circumstances surrounding Parks's grand jury testimony, but did not read it to the jury. On cross-examination by the defense, Alesha Parks testified that the statements she had made at the police station and given before the grand jury were false.

Petitioner then presented the testimony of Parks' parents, who testified about the police taking their daughter and questioning her at the police station. Mrs. Parks stated that her daughter told her she was forced to make a false statement to the police.

After the close of testimony, at 6:45 p.m., the defense counsel objected to closing arguments being heard before the next morning. The trial court asked the jury whether they wanted to continue that evening. Because they answered affirmatively, the closing arguments were heard and the jury began its deliberations at 8:26 p.m. over the defense's objection. At 10:45 or 10:46 p.m., the trial judge informed the parties he had earlier told the deputy sheriff to tell the jury at 10:45 p.m. that transportation was waiting to take them to their hotel accommodations. When the sheriff did so, the jury asked if they could have another 10, 15, or 20 minutes. While the defense attorney was making his objections at 10:50 p.m., the jury rang

5

the buzzer to indicate that it had reached a verdict. The jury was brought into the courtroom, but the sheriff informed the court that one of the jurors was upset in the restroom. The jury was taken back to the jury room and returned 30 seconds later with all the jurors present.

Petitioner was convicted of the first-degree murders of Range and Campbell. Subsequently, the trial court found that Petitioner was eligible for the death penalty, but that sufficient mitigating factors precluded him from being sentenced to death. Instead, he was sentenced to two terms of natural life imprisonment without parole.

Petitioner appealed his conviction and sentence to the Illinois Appellate Court. On appeal, Petitioner argued that: (1) he was denied a fair trial by the State's improper use of out-of-court statements; (2) the trial court improperly hastened the verdict by telling the jury that their transportation was waiting; and (3) he was not proven guilty beyond a reasonable doubt. On December 26, 1996, the Illinois Appellate Court affirmed Petitioner's conviction and sentence. Petitioner filed a petition for leave to appeal to the Illinois Supreme Court, raising the identical issues that he raised before the Appellate Court. The petition for leave to appeal to the Illinois Supreme Court was denied on December 3, 1997.

On June 30, 1998, Petitioner filed a petition for post-conviction relief in the Circuit Court of Cook County, raising the following issues: 1) the State obtained the conviction using perjured statements of witnesses who testified; 2) the State suppressed evidence favorable to Petitioner; and 3) trial and appellate counsel were ineffective. The trial court summarily dismissed the post-conviction petition on July 17, 1998. In its minute order, the trial court found that no Brady violations occurred and the full circumstances concerning Rudolph and Parks' in and out of court statements were presented to the jury. The Court determined that Petitioner's allegations

are conclusive and that the doctrine of waiver and res judicata apply. The Court further held that trial and appellate counsel were "superior" and that all salient issues were presented on appeal. The Court thus concluded that "no substantial constitutional issue is presented.... Therefore, this court hereby dismisses said P.C. petition as frivolous and patently without merit under 725 ILCS 5/122-2.1(A)(2)."

On May 17, 1999, petitioner appealed the dismissal of his post-conviction petition to the Illinois Appellate Court, First Judicial District. The Office of the State Appellate Defender was appointed to represent Petitioner in his appeal. Appointed counsel filed a motion in accordance with *Pennsylvania v. Finley*, 481 U.S. 551 (1987), indicating that there are no issues of merit upon which the Petitioner could expect to obtain any relief. The Illinois Appellate Court decided to take appointed counsel's *Finley* motion with the case. On September 30, 1999, the Illinois Appellate Court granted appointed counsel's motion for leave to withdraw and also affirmed the trial court's denial of Petitioner's post-conviction petition. The Appellate Court held that "[w]e ... find no issues of arguable merit. Accordingly, the motion of the public defender for leave to withdraw as counsel is allowed and the judgment of the circuit court is affirmed." On November 29, 2000, the Illinois Supreme Court denied Petitioner's petition for leave to appeal.

Petitioner filed a second post-conviction petition on May 7, 1999, raising the following issues: 1) the State knowingly used perjured testimony of Alesha Parks in order to obtain the conviction; 2) the State withheld evidence regarding the fact that Alesha Parks said that she gave a false statement; and 3) trial and appellate counsel were ineffective. On June 8, 1999, the trial court summarily dismissed the second post-conviction petition without comment. Petitioner then appealed to the Illinois Appellate Court regarding the dismissal of his second post-conviction petition. Appointed counsel again filed a *Finley* motion indicating that the petition is

untimely and that there are no issues of merit. On March 29, 2000, the Illinois Appellate Court granted counsel's *Finley* motion and affirmed the trial court's dismissal of Petitioner's second post-conviction petition. The Appellate Court held that we "have found no issues of arguable merit.... Accordingly, we grant the motion of the public defender for leave to withdraw as counsel and affirm the order of the circuit court of Cook County." The Appellate Court further noted that "Defendant failed to set forth facts to establish any fundamental deficiency in the first post-conviction proceeding to avoid application of the procedural bars of res judicata and waiver to the claims in his second petition ... or to otherwise set forth a cognizable claim for relief." (citations omitted). The Illinois Supreme Court denied Petitioner's petition for leave to appeal.

Petitioner then filed the instant habeas corpus petition. In his habeas petition, Petitioner raises the following claims: 1) ineffective assistance of trial and appellate counsel due to the failure to raise an alibi defense; 2) the prosecution used two witness statements improperly; and 3) appellate counsel failed to raise the issue that trial counsel was ineffective.

## DISCUSSION

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2245(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997); *see also Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law"). The federal courts may not grant habeas relief under Section 2254 unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

8

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Before a federal court may review the merits of a habeas petition, a petitioner must: (1) exhaust all remedies available in state courts; and (2) fairly present any federal claims in state court first, or risk procedural default. *See Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default."); *see also Bocian v. Godinez*, 101 F.3d 465, 468 (7th Cir. 1996) (same). "The habeas petitioner must present his federal constitutional claims initially to the state courts in order to give the state 'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *McGowan v. Miller*, 109 F.3d 1168, 1172 (7th Cir. 1997) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).

A petitioner has exhausted his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." *Wallace v. Duckworth*, 778 F.2d 1215, 1219 (7th Cir. 1985).

In this case, exhaustion is not an issue. Respondent concedes that Petitioner has exhausted his state court remedies for purposes of federal habeas review because he has no further avenues in state court through which to challenge his conviction. We now turn to the issue of procedural default.

I.      **Procedural Default**

The procedural default hurdle forbids the federal courts from addressing claims that were not fairly presented to the state court. *Jones v. Washington*, 15 F.3d 671, 675 (7th Cir. 1994).

9

Procedural default occurs either when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent state procedural requirement, *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), or when the petitioner fails to present a claim to the state courts at the time, and in the way, required by the state. *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996). In Illinois, a habeas petitioner is required to raise all arguments before the Illinois Supreme Court, even though the Court has discretionary control over its docket. *O'Sullivan v. Boerckel*, 526 U.S. 838, 843 (1999).

In this case, Respondent contends that Petitioner has procedurally defaulted his claims for: 1) ineffective assistance of trial and appellate counsel for failing to investigate his alibi defense; and 2) ineffective assistance of appellate counsel for failing to raise the claim of trial counsel's alleged ineffectiveness.

The grounds for both ineffective assistance of counsel claims raised in this habeas petition were first raised in Petitioner's second post-conviction petition in state court. In Illinois, issues which could have been presented during direct appeal or in the first post-conviction petition, but were not, are deemed waived for purposes of post-conviction review. *See People v. Franklin*, 167 Ill.2d 1, 656 N.E. 2d 750, 753 (1995). Moreover, because the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 et seq. contemplates the filing of only one post-conviction petition, "any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." *People v. Flores*, 606 N.E.2d 1078, 1083 (Ill.1992). *See also Stewart v. Lane*, 60 F.3d 296 (7th Cir. 1995) (petitioner's claims of ineffective assistance of counsel raised for the first time during petitioner's second post-conviction petition are not reviewable). Thus, only claims which could not have been raised in the original post-conviction

petition or on direct appeal are preserved for subsequent post-conviction petitions. *See Flores*, 606 N.E.2d at 1086.

In this case, Petitioner's habeas claims of ineffective assistance of counsel could have been raised in the first post-conviction petition. The Illinois Appellate Court, in denying the second post-conviction petition, specifically held that "[a]lthough the Act contemplates the filing of only one post-conviction petition, successive petitions may be allowed when the proceedings on the initial petition were deficient in some fundamental way. . . . Defendant failed to set forth facts to establish any fundamental deficiency in the first post-conviction proceeding to avoid application of the procedural bars of res judicata and waiver to the claims in his second petition. . . or to otherwise set forth a cognizable claim for relief." (citations omitted).

In the Seventh Circuit, to determine whether a petitioner has forfeited or procedurally defaulted any of his claims, we must look solely to state law. In fact, as the Seventh Circuit has explained, "[f]orfeiture depends on state law, and it is accordingly essential to know whether the state courts have either held that a procedural misstep is a forfeiture, or would so hold if a collateral attack were filed in state court." *McBride*, 74 F.3d at 147. Here, the Illinois Appellate Court held that Petitioner forfeited these claims pursuant to Illinois state waiver principles. It is not our place to contradict these types of determinations.

In light of the foregoing, Petitioner has failed to present his claims to the state courts at the time, and in the way, required by the State. These claims could have been, but were not, raised in the first post-conviction petition. Accordingly, Petitioner's claims for ineffective assistance of counsel due to counsel's failure to call alibi witnesses and appellate counsel's

11

failure to raise the ineffective assistance of trial counsel issue on appeal are procedurally defaulted.

A federal court may nonetheless address the merits of a procedurally defaulted claim if the petitioner can establish cause and prejudice that would excuse it or, alternatively, establish that he fits within the miscarriage of justice exception to the cause and prejudice rule. *Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977). Beginning with the cause and prejudice standard, the Supreme Court has interpreted "cause" under this test to be something external to the petitioner which is both beyond his control and which cannot be fairly attributed to him. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In order to establish prejudice, the petitioner "must show not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Petitioner has failed to establish cause and prejudice in his petition. Petitioner makes no attempt to show that the alleged ineffectiveness of counsel infected his trial with errors of constitutional dimensions. Two eyewitnesses testified that they saw Petitioner immediately after the shootings at the scene of the murders. Therefore, the possibility of prejudice is remote. Moreover, Petitioner has not shown *any* excuse for his failure to raise these issues in his first post-conviction petition, let alone external reasons beyond his control and which cannot be fairly attributable to him.

Although Petitioner has failed to establish cause and prejudice to excuse his procedural default, he can still overcome this forfeiture by showing that he fits within the "miscarriage of justice" exception. This exception is limited to those extraordinary cases in which the Petitioner

12

is actually innocent of the crime for which he is imprisoned. *Bell v. Pierson*, 267 F.3d 544, 551 (7th Cir. 2001). Therefore, it requires a colorable claim of actual innocence, as opposed to legal innocence, coupled with an allegation of a constitutional claim. *See Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992). The miscarriage of justice exception applies only if the petitioner can demonstrate that it is more likely than not that no reasonable jury would have convicted him in the absence of the alleged defect in the state court proceedings. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In this case, Petitioner makes no colorable claim of actual innocence. As mentioned above, two eyewitnesses placed Petitioner at the scene of the murders. Thus, it is likely that a reasonable jury would have convicted him anyway.

Accordingly, Petitioner's claims for ineffective assistance of counsel, Counts I and III of the habeas petition, are barred from federal habeas review.

**II. Merits Of The Claim Properly Presented**

Petitioner's next claim for habeas relief is that the prosecution used out-of-court statements which allegedly were false or coerced. This claim was raised in the first post-conviction petition and was appealed to both the Illinois Appellate Court and Illinois Supreme Court on appeal of the denial of the first post-conviction petition. Therefore, this claim has been properly preserved for review.

Title 28, United States Code, Section 2254(d) governs the consideration of any claim adjudicated by a state court on its merits. Under that statute, we may grant habeas relief only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(2)(1). Under subsection (d)(2), habeas relief is possible if the state

13

court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), attempted to clarify the applicable standard of review within the meaning of section 2254. The Court noted that the act does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. *Id.* at 385. Recognizing the need for further clarification and direction to lower courts, the Supreme Court concluded that the "[the act] plainly sought to ensure a level of 'deference to the determinations of state courts,' as long as those decisions do not conflict with federal law or apply federal law in an unreasonable way." *Id.* at 376. Additionally, the Supreme Court determined that, in passing the statute, "Congress wished to curb delays, to prevent 'retrials' on federal habeas petitions and to give effect to state convictions to the extent possible under the law. When federal courts are able to fulfill these goals within the bounds of the law, [the statute] instructs them to do so." *Id.* Therefore, this Court is directed to apply a deferential review of the state court decision unless it is determined that the state court violated federal law.

In Count II, Petitioner claims that the State violated his due process rights because the State failed to inform the defense, prior to trial, of the witness Alesha Parks' retraction of her prior statement to the police. Petitioner argues that the State's conduct violates the rules enunciated in *Brady v. Maryland*, 373 U.S. 83 and *Giglio v. United States*, 405 U.S. 150.

In order to prove a due process violation on the ground of false testimony, Petitioner is required to submit evidence showing not only that the witness committed perjury, but also that the prosecutors knew that her testimony was false. *Del Vecchio v. Illinois Dept. of Corrections*, 31 F. 3d 1363, 1387 (7th Cir. 1994). Moreover, Petitioner must show that there is a reasonable

14

likelihood that the false testimony could have affected the judgment of the jury. *See United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995). "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990).

In this case, Petitioner has not shown that Parks' testimony was false, much less that the prosecutors knew of its falsity. As far as this Court can tell, there is no credible evidence that Parks told the Assistant State's Attorney that her previous statements were false prior to trial. Petitioner presents no credible evidence relating to the alleged recantation or relating to the prosecution's knowledge of Parks' alleged perjury. Petitioner merely alleges that after Parks testified "the defense learned purely by serendipity, in fact, Alesha Parks many months prior to the trial had told the very same Assistant State's Attorney, who was examining her . . . that she had indeed made false statements in the police station and to the Grand Jury." More proof is required than "serendipity." Petitioner does not indicate how he learned this information, and he has presented no affidavits of persons with knowledge to establish that the government used false testimony and knew that it was false. In the absence of such evidence, Petitioner is not entitled to habeas relief. *See Del Vecchio*, 795 F. Supp. at 1418.

## CONCLUSION

For the foregoing reasons, we deny the § 2254 petition for a writ of habeas corpus brought by Petitioner James Fields. This is a final and appealable order. This case is terminated.

It is so ordered.

/s/ Wayne R. Andersen
Wayne R. Andersen
United States District Judge

Dated: November 19, 2003